## EXCHANGE NATIONAL BANK OF FITZGERALD v. HENDERSON.

1. A promissory note given for an illegal and immoral consideration is void and can not be enforced, even in the hands of an innocent purchaser for value, before due, and without any notice of defense. And this is so even if the consideration of the note is in part legal.
(a) Buying or selling or offering to buy or sell a vote at any election in this State, or in any county thereof, is both illegal and immoral.
(b) Buying or selling votes and political influence is both illegal and immoral; and a note having as a basis such consideration, in whole or in part, is void and can not be enforced in the hands of an innocent purchaser.
2-7. The court did not err in admitting in evidence the testimony objected to, of the several witnesses for the defendant, under the facts of this case; nor in refusing to charge the jury as requested in writing by the plaintiff's counsel.
8 There was no error in overruling the motion for a new trial.
                    JANUARY 18, 1913.

Complaint. Before Judge Whipple. Irwin superior court. December 30, 1911.

*L. Kennedy, Elkins & Wall,* and *Haygood & Cutts,* for plaintiff. *H. J. Quincey* and *W. H. Horne,* for defendant.

HILL, J. The Exchange National Bank of Fitzgerald brought suit against J. A. J. Henderson, as maker, and Mitchell & Paulk, as indorsers, upon· a promissory note for $400. The note was payable to Mitchell & Paulk, who indorsed it to the plaintiff for value, before due. The note itself does not disclose the consideration, and only recites that it is given "for value received." At the appearance term of the court, J. A. J. Henderson, the maker of the note, filed his plea averring: that the note was without consideration, and was obtained by fraud; that the note was given for a certain patent right; that the consideration had failed, because the payees of the note failed and refused to make over or to transfer to the defendant the interest in and to the patent right for which the note was given; and that they were unable to do so for the reason that they did not own or have, at the time of the execution of the note, any such patent right as they claimed to have. By an amendment to the original plea, J. A. J. Henderson set up the defense "that the note sued upon  .  . is void, and that the plaintiff can not recover thereon, for the reason that said note was given for an immoral and illegal consideration, to wit: to purchase *political influence and votes* in an election held in said county for the purpose of removing the court-house from Irwinville to Ocilla," and that the payees fully understood that the consideration moving the maker of the note to enter into the contract for the purchase of an interest in the patent right was the agreement that he was to obtain the political influence of the payees to secure the removal of the court-house, and that the purchase of such interest was a mere blind to cover up such illegal and immoral contract, which was the sole consideration for the giving of the note sued on. The amendment to the plea further averred that the transaction was part of a general scheme whereby certain citizens of Ocilla, including the defendant, in consideration of the agreement on the part of Mitchell & Paulk to exert their political influence in favor of the removal of the court-house, gave notes in the aggregate sum of $2,500 for the purchase of a half interest in the patent rights. There was much testimony both for the defendant and plaintiff. Most of the witnesses for the defendant testified that they would not have signed the notes except that they thought that they were signing them in order to get the influence and votes of Mitchell & Paulk for the removal of the county

site from Irwinville to Ocilla. William Henderson, who represented those interested in having the county site removed to Ocilla, and who procured the notes, stated to each one signing that Mitchell & Paulk would use their influence for Ocilla, and it was on this representation that the notes were signed. It appears from the evidence that Mitchell did use his influence in behalf of Ocilla; in fact he favored the removal to Ocilla before there was put in motion the scheme to sell the stock in the corporation which was organized to manufacture and sell the patented implement. But Paulk did not vote for, or use his influence for Ocilla. Some of the signers of the notes received certificates of stock in the corporation. Some of them, including the defendant, gave written recommendations of the merits of the patented implement. The defendant testified that "part of the consideration of that note was subscription to stock in that corporation;" that "the stock was sent to me enclosed in an envelope," but that he did not return it, as he did not know who sent it and did not consider the stock worth anything. A patent was duly issued and a charter procured for the corporation. The original payees of the note, Mitchell & Paulk, denied in their testimony that the consideration of the note was their vote and influence in behalf of Ocilla, but insisted that it was given for an interest in a patented fertilizer distributor and for stock in a corporation to manufacture and sell the distributor. The jury returned a verdict for the defendant. A motion for a new trial was overruled, and the plaintiff excepted.

1. The main question to be determined in this case is whether the promissory note sued on is void in the hands of an innocent purchaser for value, who took it before due and without notice of any defense. The Civil Code, § 4286, declares: "The bona fide holder for value of a bill, draft, or promissory note, or other negotiable instrument, who receives the same before it is due, and without notice of any defect or defense, shall be protected from any defenses set up by the maker, acceptor, or indorser, except the following: 1. Non est factum. 2. Gambling, or immoral and illegal consideration. 3. Fraud in its procurement." It is insisted by the defendant, that the real consideration of the note sued on was the votes and political influence of the payees of the note, Mitchell & Paulk, in agreeing to thus assist the defendant and others in having the county site of Irwin county removed from

Irwinville to Ocilla, where the defendant lived; that, although the plaintiff claims that the note was given solely for an interest in a patent right and stock in a corporation which was to manufacture a fertilizer distributor, the real consideration was the votes and political influence of the payees in behalf of Ocilla; that this consideration alone induced the defendant to sign the note; and that such consideration was both immoral and illegal, and the note unenforceable for that reason. Undoubtedly, if the note sued on was not given for the stock in the corporation, or for an interest in the patent right, but was really given for an immoral and illegal consideration, it would be void and unenforceable, even in the hands of an innocent purchaser. Civil Code, § 4286. See *Rhodes* v. *Beall,* 73 *Ga.* 641; Civil Code, § 4253. If the real consideration of the note was the buying of votes and political influence, for the purpose of removing a county site at an election to be held to determine that question, such a consideration would be against public policy, and void. 1 Page on Contracts, § 410, and cases cited. Is the buying of political influence to secure the removal of a county site immoral and illegal?

In the case of *Jones* v. *Dannenberg Co.,* 112 *Ga.* 426, 428 (37 S. E. 729, 52 L. R. A. 271), Mr. Justice Little said: "But the issue is still further narrowed to the question whether the averments of the plea set up a contract the consideration of which was both immoral and illegal. It will be noted that the statute requires these two conditions to exist jointly, to let in the defense. As was said in the opinion in the case of *Rhodes* v. *Beall,* 73 *Ga.* 641, 'the statute which makes such a contract illegal and void must also make the same a crime, or the act itself must be immoral and *contra bonos mores.*' An examination of the plea discloses the fact that its averments do not designate the offense for which the husband of the plaintiff in error was arrested, nor can we gather from it the nature of the crime with which he was charged. It may have been a felony, and, equally as well, it may have been a misdemeanor." And again, on p. 430: "So we think that if we confine the averments made in the plea to their narrowest limits, and assume, because it was not otherwise pleaded, that the criminal offense for the settlement of which it is averred that the note and mortgage were given was a misdemeanor, then the consideration was an illegal one. Was it an immoral one in the sense of the

statute? One of the definitions of 'immoral' given in the Standard Dictionary is 'hostile to the welfare of the general public.' And Mr. Bouvier defines immorality to be 'that which is contra bonos mores;' and in defining what contracts are contra bonos mores, the same author says, among other things which he names, that those which have a tendency to mischievous or pernicious consequences are void as being contrary to good morals." Is the buying of votes and political influence a crime under our law? Under the definition cited above, selling or buying votes or political influence is undoubtedly contra bonos mores, but for it to be both immoral and illegal it must appear that the act is also a crime under our law, or that it is of itself immoral and opposed to public policy; for, as observed by Mr. Justice Little in the *Jones* case, supra, these two conditions must exist conjointly, to let in the defense. We hold that the act of buying political influence is against public policy. Is it also illegal under our statute to buy votes and political influence? The Penal Code, § 665, declares: "If any person shall—1. Buy or sell, or offer to buy or sell, a vote, or shall be in any way concerned in buying or selling, or contribute money or any other thing of value for the purpose of buying a vote at any election in this State, or in any county thereof; . . he shall be guilty of a misdemeanor. . . The hiring of workers qualified to vote in said election or primary before or on the day of election, for the purpose of canvassing for or influencing votes in behalf of any candidate, or the being hired for said purpose, is a misdemeanor." Under the averments of the defendant's plea, the note sued upon "is void," and "the plaintiff can not recover thereon, for the reason that said note was given for an immoral and illegal consideration, to wit, to purchase political influence and votes in an election held in said county for the purpose of removing the court-house from Irwinville to Ocilla." There was evidence tending to show that such was the consideration of the note sued on, and the jury under the evidence was authorized to find such to be the case. The evidence showed that W. A. Mitchell and J. B. D. Paulk were partners, owning a certain patent right to a fertilizer distributor, and were without funds with which to promote it. They endeavored to interest certain citizens of Ocilla in the patent, including the maker of the note, and to sell them a half interest in it, and also stock in the corporation created to promote the

enterprise. The defendant and other Ocilla citizens were also interested in the campaign then pending to have the county site of Irwin county removed from Irwinville to Ocilla. Various conversations were had between the citizens of Ocilla, including the defendant, and one or both members of the firm of Mitchell & Paulk, which tended to show an agreement that if Mitchell & Paulk would vote for and use their political influence in favor of Ocilla, the defendant and the other citizens of Ocilla associated with him in endeavoring to have the county site removed would take stock in the corporation to promote the patent right. The evidence for the defendant tended to show that Mitchell promised to vote and use his influence for Ocilla, and that his partner Paulk would do the same. Paulk did not vote for or use his influence for Ocilla, and Mitchell & Paulk both denied selling or offering to sell their vote or influence for Ocilla. J. A. J. Henderson testified in part as follows: "There was a conversation between Mr. Mitchell and myself, in which he told me if we would get up this subscription for the stock for this patent right we would have the following of him and Mr. Paulk; and he connected Mr. Young with it. He said that we would secure that district over there that they lived in, secure their influence and get that district. I thought that was a fair and square understanding as I ever had [with] anybody in my life. I was anxious about the court-house removal question, and they were rather against us in a political way, and when you all got it up we did it for the purpose of securing that influence; that was my understanding. . . The only thing that moved me to give the note was to get that political influence; that was the agreement with Mr. Mitchell. I remember one conversation with Mr. Paulk in Ocilla before the election; and I think the words he used were, 'Well, if you take this stock here in Ocilla, the interest in our patent right, it is going to change my feelings towards you. I see you are all interested in me, and I will be more so towards Ocilla.' Our political feelings had always been bad; that is the conversation in substance that we had. . . Before the notes were signed I had an agreement with Mr. Mitchell, whereby he was to use his influence in the election. As near as I can give it to you, it was that if we would get up this subscription, take half interest in this patent right, Paulk and his influence would be with us in this court-house fight; and after it was over,

Mr. Mitchell told me he was never so surprised in his life as he was when John Paulk didn't do it. I think Mr. Mitchell did use his influence for us. The substance was that if we went into this company and carried out that plan and got these notes, Paulk's influence would be for us." R. L. Henderson, a witness for the defendant, and who was defendant in another suit on a similar note given by him to Mitchell & Paulk, testified: "What I gave the note for was for the influence of Mr. Mitchell and Mr. Paulk to help us remove the court-house to Ocilla; that was what I would consider the consideration. The negotiations were carried on by my brother, William Henderson. He represented to me that that would secure the influence of Mr. Mitchell and Mr. Paulk." William Henderson, a witness for the defendant, and also a defendant in his own case, testified in part as follows: "I know W. A. Mitchell and J. B. D. Paulk. Along in May, 1907, at the time these distributor notes were given, there was a political campaign going on here in Irwin county about removing the court-house from Irwinville to Ocilla. I was considerably interested in that campaign and thought of nothing else about that time. I was in favor of bringing the court-house here. J. B. D. Paulk had political influence, and had always been strong, politically, here. I know what his attitude was about the court-house removal question. I didn't hear him express himself, but it seemed to me like he ought to have been in Ocilla. I discussed this matter with W. A. Mitchell a number of times and with Paulk one time. I told Mitchell that there was a little politics in this thing if nothing else; and more politics than anything else; and if he could carry J. B. D. Paulk and Joe Young, and he told me that Joe's wife was already for Ocilla, that Joe would do anything in the world for him and they would help us in this election. I asked him over again about Paulk, if he would help us; and he said, yes, he would if we, the people of Ocilla, got up this, and I told him I could get it right away if they would promise to do that. He didn't say just that if the people of Ocilla would get up this money for this interest, but that was what we were talking about, and what we were leading to. Mr. Mitchell was wanting to get stock for this patent right, and I was wanting him to promise to help us in the court-house election, and told him if he would do it I could get it up right off, and he was perfectly willing himself. I

asked him if Mr. Paulk would favor Ocilla if these notes were signed up, and he said he would; and I told him, 'I can go and get it up in two hours.'" Other witnesses for the defendant testified substantially to the same effect as those above quoted. One can not read the testimony in this case and not be impressed with the idea that it was understood between one of the partners (Mitchell) and the defendant, J. A. J. Henderson, and the other witnesses who testified that "the consideration causing me to sign this note and *indorse the others* was the agreement I had with Mitchell for his and Paulk's influence in the election," that the citizens of Ocilla were to get the votes and influence of the firm of Mitchell and Paulk for Ocilla, in consideration for the notes. If Mitchell, a member of the firm of Mitchell & Paulk, agreed to sell, in connection with a firm transaction, the votes and influence of the firm, such agreement would taint the whole transaction, and his copartner would be affected. A contract based upon such a consideration would not only be immoral and against public policy, but would be illegal as well. It would be both illegal and immoral. Such a contract can not be enforced under our law. The legislature of the State, by the statute quoted from above, has wisely endeavored to throw around our elections every safeguard to prevent corrupt practices at and preceding elections held in this State, and makes the buying or selling, or offering to buy or sell, votes at any election a misdemeanor. Under section 665 of the Penal Code, supra, it is illegal, to sell or offer to sell votes "at any election in this State." If, therefore, the consideration of the note sued on was in payment or part payment for the political influence and votes of Mitchell and Paulk, even though a part of the consideration was an interest in a patent right, or stock in a corporation to promote the patent right, still the plaintiff would not be entitled to recover on the notes as against the defendant, if the real consideration was based upon the purchasing of the votes and political influence of the payees in favor of Ocilla. The jury has found, in effect, that such was the consideration of the notes sued on, and we think there was sufficient evidence to support their verdict.

2. The first, second, third, and fourth grounds of the motion for a new trial raised substantially the same question. Evidence was admitted by the court, over objection, which tended to show

that the inducement to the defendant to sign the note sued on, and to others who were parties to the scheme and who signed similar notes, was the votes and political influence of the payees, Mitchell and Paulk, in helping to remove the county site from Irwinville to Ocilla, where the defendant and the others who signed similar notes resided. It is insisted that the evidence objected to was irrelevant; and that that which referred to the inducement offered to others to sign similar notes was as to a matter between other parties. Under the ruling made in the first division of this opinion, it follows that evidence which tended to show that the consideration of the note sued on was the votes and political influence of the payees of the note in favor of Ocilla was admissible for that purpose. It is difficult to prove an express consideration of the kind alleged. No one would readily admit that he was buying or selling a vote. As one witness expressed it, "it was a pretty ticklish thing coming out that way with a man like him, to what looked like buying him, and I wanted to go as far as I could." Slight circumstances, therefore, might shed great light on such a transaction. And where there was a general scheme to promote a patent right, on one side, and a general scheme to have a county site removed, on the other side, conversations between the parties to the two general schemes which tended to show what the real consideration of the notes sued on was were admissible for that purpose. Nor can it be said, under the facts of this case, that the evidence of some of the witnesses is inadmissible, as being res inter alios acta, because they were not parties to the present suit.

3. The fifth ground of the motion assigns error because the court admitted in evidence, over objection, the testimony of the defendant's witness R. L. Henderson, as follows: "In a conversation after the court-house election I stated to Mr. Mitchell that was the consideration of my note, and the reason I went into the thing was to help out in the removal of the court-house by Mr. Paulk's influence, and he, Mr. Mitchell, stated that he regretted very much that J. B. D. Paulk did not help us to remove the courthouse." The objection was that this conversation occurred after the transaction, and was merely hearsay, and not binding on the parties. This evidence was admissible as being in the nature of an admission.

4. The court allowed H. B. Sutton, one of the defendant's wit-

nesses, to testify, over objections of the plaintiff, as follows: "I had a conversation with W. A. Mitchell during the court-house campaign in 1907, about the subscription to certain stock or buying half interest in a patent right for a guano distributor, and he was trying to get me to subscribe, and we were talking about the political situation about removing the court-house; and I told him that I was very sorry that J. B. D. Paulk wasn't with us; and he told me that all Ocilla would have to do would be to buy this stock, and Paulk would come in all right. I don't remember whether I ever told this conversation to William Henderson or any other parties here in Ocilla or not." It is insisted that this conversation was not had with any of the parties to this suit, and did not appear to have been communicated to either of them; so that no one could have contracted on the faith of it. We think the evidence was properly admitted, for the reason given in the second division of this opinion.

5. Error is assigned on the refusal of the court to charge the jury, as requested in writing by plaintiff's counsel before the beginning of the charge of the court, as follows: "If you find from the evidence that any member of the firm of Mitchell and Paulk agreed that if the defendant and other persons named in the defendant's answer would become interested, either by going into a corporation or otherwise, in a patent right of a manure distributor, and giving their notes for their respective shares or interest therein, then Mitchell and Paulk, or either of them, would use their influence in favor of Ocilla in the county site removal contest, but if you further believe that there was no agreement whereby Mitchell and Paulk, or either of them, was to sell his vote, and no agreement whereby either of said parties was to buy any other person's vote, or to corruptly influence any voter,—then I charge you that such agreement would not render the consideration of the note illegal and immoral, and under such circumstances you should find a verdict in favor of the plaintiff." Under the facts of this case, this refusal to charge was not error.

6. The plaintiff requested the court in writing to charge the jury as follows: "A mere agreement to use one's influence in favor of one side in a public issue, without agreeing to sell one's vote or corrupt any other voter, is neither illegal nor immoral; and in order to defeat a recovery by an innocent holder of a negotiable

note, it would have to appear that the consideration of the note was both immoral and illegal." Error is assigned on the refusal to so charge. This request to charge was not an accurate statement of the law applicable to the real issues of this case, and the court did not err in declining to so instruct the jury.

7. A request to charge that which had already been "charged in substance" was properly denied, and the refusal to "charge the same just as requested" by counsel for the plaintiff will not require a new trial.

8. The court did not err in overruling the motion for a new trial.          *Judgment affirmed.   All the Justices concur.*