## Martin v. Francis, et al.

(Decided January 30, 1917.)

## Appeal from Knott Circuit Court.

1. Contracts—Affecting Election to Office—Illegal and Corrupt Bargains Concerning—Courts Will Not Grant Relief to Parties.—A bargain, under the terms of which the Republican nominee of the party for an office withdrew from the race in favor of the Democratic nominee for the office, was illegal and corrupt, and neither of the parties to the bargain should be given any relief by a court concerning anything growing out of the transaction.

2. Contracts—Affecting Election to Office—Illegal and Corrupt Bargains Concerning—Right of Parties to Recover Money From Stakeholders.—Where, pursuant to a bargain entered into between candidates for a public office who had been nominated by their respective parties, one of them withdrew in consideration of the agreement of his opponent to give him, if elected, a share in the

office, and the nominee who induced the other to withdraw put in the hands of a stakeholder five hundred dollars to insure the performance of his contract, he could not, after he had performed his contract, recover from the stakeholder the money.

3. Gaming—Gambling Contracts—Right of Parties to Recover From Stakeholder Money Deposited.—Money that is wagered or bet and deposited in the hands of a stakeholder to be held by him until the outcome of the wager or bet is determined, may, under section 1959 of the Kentucky Statutes, be recovered from the stakeholder by the person making the deposit, if it is still in the hands of the stakeholder.

4. Contracts—Affecting Election to Office—Corrupt Bargains Concerning—Right of Parties to Recover Deposit From Stakeholder.—Contracts having a tendency to injure the public service, or interfere with the free exercise of the elective franchise, or that affect public offices, are in a class distinct from mere gambling contracts, and the rule that a party to a gambling contract can recover the deposit from the stakeholder before it has been paid over, does not apply to them.

5. Contracts—Affecting Election to Office—Corrupt Bargains Concerning—Right to Recover Money From a Stakeholder.—Parties concerned in corrupt bargains affecting the elective franchise, or that involve the trading or trafficking in public offices, cannot come into court and obtain relief on acount of anything connected with or arising on such contracts unless it affirmatively appears that the party asking such relief has in good faith rescinded or repudiated, or attempted in good faith to rescind or repudiate, the contract before anything material looking to its accomplishment had been done by any person connected with it.

6. Contracts—Affecting Election to Office—Corrupt Bargains Concerning—When Money May be Recovered From a Stakeholder.— If a party who has made a corrupt bargain affecting a public office, or the elective franchise, and pursuant thereto has made a deposit with a stakeholder, he may recover the deposit from the stakeholder before it is paid over, if he can affirmatively show that after entering into the contract he changed his mind and in good faith abandoned the contract and everything connected with it.

W. A. STANFILL, JOHN CAUDILL, W. E. FAULKNER and FAULKNER & FAULKNER for appellant.

J. D. SMITH and SMITH & COMBS for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

Passing several questions of practice raised by counsel for appellant and going at once to the merits of the case, we find that on October 31, 1913, Martin, the appellant, together with Napier, Sturgill and Casebolt, executed to J. D. Smith a promissory note for five

(six) hundred dollars, payable one month after date; that this note was assigned by Smith to one Cody, and by Cody to Francis; that in 1914 Francis brought suit on this note against the payors; that the appellee, Richie, in November, 1915, came into the case by a petition to be made a party, which petition he made a cross-petition against the defendant, Martin, now the appellant.

In his petition as amended he set out "that one H. Cody was the regular nominee of the Republican party for jailer of Knott county, and that this defendant was the regular nominee of the Democratic party for the same office in said county shortly prior to the regular November election, 1913, and to be voted for at said election. Defendant says that he and the said H. Cody, on or about the 30th day of October of said year of 1913, entered into an agreement by which the said H. Cody was to resign his Republican nomination for the office of jailer, and in consideration therefor, this defendant agreed to appoint said H. Cody a deputy jailer and to give to him the entire proceeds of said office for one-half of his term; that in order to assure to the said H. Cody the due performance of the said contract upon the part of this defendant, he, the defendant, deposited and placed in the hands of W. M. Sturgill the sum of five hundred dollars to be held in trust by the said Sturgill, and to be repaid to this defendant in the event he performed the said contract, but in the event that he failed to perform said contract, said fund was to be paid over to the said H. Cody. Said W. M. Sturgill placed said money in the hands of one John D. Smith pursuant to the terms of said agreement wherein this was to be done for the same purpose, after no further nomination could be made by the Republican party for said office.

"This defendant says that he is informed, so believes, and charges that said contract was and is illegal and contrary to public policy, and that he now and hereby repudiates same. Defendant says that said J. D. Smith, heretofore without his knowledge, delivered said fund to the defendant, S. H. Martin, and no part of it has been paid to the said H. Cody.

"He says that the money loaned to defendant, S. H. Martin, by J. D. Smith, for which the note in controversy was executed, to-wit, five hundred dollars, was the property of this petitioner; that he placed said

money in the hands of the said John D. Smith to hold
for him as his bailee and subject to his orders; that he
did not authorize said John D. Smith to loan said
money to the said S. H. Martin or any one else, but
that he did so without his consent; that he did not place
said money in the hands of said Smith for the purpose
of loaning it, or for the purpose of using it in the elec-
tion to buy votes, or otherwise. That the defendant, S.
H. Martin, well knew the facts at the time and knew
that the money loaned to him by the said John D. Smith
was the money and the property of this petitioner; that
he also knew for what purpose it was placed in the
hands of the said J. D. Smith to hold as bailee for this
petitioner."

A demurrer by Martin to this pleading of Richie
was overruled. After this the petition of Francis was
dismissed, and it appearing from the record that Mar-
tin failed to deny the averments of the pleading of
Richie, judgment went against him for the debt, with
interest, and he appeals.

Having reached the conclusion that the demurrer of
Martin should have been sustained and the cross-peti-
tion of Richie dismissed, we will proceed to state the
reasons that influenced us to take this view of the case.

It will be seen from the cross-petition that in con-
sideration of the agreement of Richie to appoint Cody
his deputy jailer and give him the fees of the office for
one-half of his term, or two years, and in further con-
sideration of the fact that he deposited with Sturgill
five hundred dollars to insure the fulfillment of the con-
tract with Cody—which money Cody was to have in the
event Richie failed to comply with his agreement—Cody,
who was the regular nominee of the Republican party
for the office of jailer of Knott county, would withdraw as
a candidate for this office a few days before the regular
election and when it was too late for the Republican
party to nominate another candidate for the office of
jailer in place of Cody.

We may further assume, as a reasonable inference
from the averments of the pleading and the failure of
Cody to complain, that Richie was elected jailer at the
November election, 1913, and performed his contract
with Cody by appointing him deputy jailer and giving
him the fees of the office as stipulated in the contract.

With this understanding of the record, the first question to be determined is the validity of the contract between Richie and Cody. Upon this subject we have no hesitancy in saying that it was immoral, illegal and against public policy. Under our form of government nearly all of our public officers are elected by the people at regular elections held in the November preceding the beginning of the term of office in the following January, and in all cases, with rare exceptions, candidates for public offices at the regular November election are nominated as candidates for the offices at the primary election held in August preceding the regular November election by the voters of the party with whom the candidates affiliate.

It also fairly appears from the pleading that Richie at the primary election held in August, 1913, had been nominated as the candidate of the Democratic party for the office of jailer and that Cody at this primary election was the nominee of the voters of the Republican party as its candidate for this office. We may further properly assume that the voters of the respective parties in Knott county, when they nominated these men as candidates for the office of jailer at the primary election held in August, 1913, had the right in good faith to believe that they would be the candidates of the respective parties at the regular November election. And when a candidate is so nominated at a primary election, he should not be permitted to practice a fraud on the people who nominated him and defeat the right of the party to have a candidate for the office for which he was nominated by entering into a corrupt agreement with the candidate of the opposing party, or with any other person or set of persons by which he will withdraw as a candidate at a time when the party that nominated him cannot in the regular way nominate a candidate in his place, or at any time after he has been nominated. The sale by a candidate of his nomination, accompanied by his withdrawal, is an illegal, dishonest and immoral thing. It is against public policy because it affects the integrity of the elective franchise and puts it in the power of a corrupt person to defeat the will of the people, or, at any rate, to deprive a large part of them of the opportunity to have a candidate of their choice for the public office involved.

In addition to these reasons, arrangements such as were entered into between Richie and Cody affect the public good, because they impose on a public officer the obligation to appoint an assistant or deputy without reference to his fitness or qualifications for the place, and only for the reason that it was a part of an agreement entered into not for the benefit of the public but pursuant to a corrupt bargain detrimental to the public.

Richie of course occupies no better place in this transaction than Cody. He was an active, participating party in the transaction, guilty of the same immoral, illegal and corrupt conduct of which Cody was guilty. The public reasons that would forbid Cody to sell his nomination would forbid Richie to buy it. One of them was a bribe-taker and the other a bribe-giver, and in a court of justice neither of them, in any matter growing out of this transaction, should be entitled to any consideration. If Richie had failed to fulfill his corrupt bargain with Cody, plainly a suit by Cody seeking performance of the contract or any part of it would be promptly dismissed, and likewise if Richie had performed this contract and in any way or manner Cody had secured possession of the five hundred dollars deposited by Richie to secure its performance, Richie, if he brought a suit to recover it from Cody, would be turned out of court. The courts would have nothing to do with either of them. It would not give to either any relief, but would leave them to settle their differences without the assistance of the processes of the law.

It is said, however, that this court in the case of Commonwealth v. Sheeran, 145 Ky. 361, partially at least recognized the validity of contracts made between contending candidates for office by which one of them, for a stipulated consideration, should withdraw as a candidate in favor of the other. But we do not find in the opinion in that case any ground upon which to rest an argument that the validity of such a contract would be sanctioned. The question in that case did not concern the validity of a contract, and the court in the opinion was careful to say so.

In that case Sheeran and one Taul were contending candidates in the Republican party for the nomination for the office of sheriff of Breckinridge county, and before the nominating convention was held, Taul and Sheeran entered into an agreement that Taul would

withdraw as a candidate for the nomination in consideration of Sheeran's appointment of him as deputy in the event of his election. Pursuant to this arrangement Taul did withdraw as a candidate for the nomination, and thereafter Sheeran, who was nominated and elected, appointed Taul a deputy pursuant to the contract. Subsequently the Commonwealth, on the relation of the Commonwealth's Attorney, brought suit against Sheeran asking the forfeiture of his office upon the ground that the agreement Sheeran entered into was in violation of section 3740 of the Kentucky Statutes, and worked a forfeiture of his office. The court, however, found that this arrangement between Sheeran and Taul was not in violation of the statute relied on by the Commonwealth and dismissed the suit. This is all that was decided in that case.

In the later case of Campbell v. Offutt, 151 Ky. 229, the court had before it a case like this: Campbell and Young, attorneys, assumed liability on a note for the benefit of Offutt, and Offutt who expected to be appointed revenue agent by Bosworth, who was then a candidate for Auditor, executed to Campbell and Young his note for the liability they had assumed, and agreed with them that if he should be appointed revenue agent he would employ them in his official capacity as his attorneys. Bosworth was defeated as a candidate for Auditor and Offutt did not get the office of revenue agent. Thereupon Campbell and Young brought suit against Offutt on the note he had executed to them under the circumstances stated. In holding that they could not recover, the court said:

"Such an agreement is contrary to public policy and is void. If Offutt had secured the office and had refused to employ Campbell and Young as his attorneys to attend to the business of the office and they had sued him upon this contract, no court would have enforced it, or given damages for its breach. The law requires of a public officer that he shall use his best skill and judgment for the protection of the public interest, and an agreement before his appointment to divide the fees of the office with an attorney, if sustained, might seriously cripple the public service; for in this event the public would secure the services of an attorney in some instances who would offer the best terms to the official to secure the employment. It is not

material here that Offutt failed to get the office by reason of the fact that Bosworth was not elected Auditor, and it is not material that the attorneys would in fact have discharged their duties faithfully and well. The agreement being one which the law will not tolerate, cannot be enforced. The consideration of the transaction is the illegal agreement, and as the notes rest upon an illegal transaction, they cannot be enforced."

But conceding the illegality of the contract between Richie and Cody, and further conceding that a suit by either of them to obtain any relief arising out of this transaction would be dismissed, the argument is made on behalf of Richie that this money was delivered by Smith, the stake-holder, to Martin, without the consent of Richie, and, therefore, Martin should be treated as holding it in the same manner that Sturgill originally held it, as he had knowledge of the arrangement under which the money was placed in the hands of Sturgill. And so it is said that as Richie would have the right to recover the money from Sturgill while it was in his hands, so he has the right to recover it from Martin who voluntarily and with knowledge of the facts took the place of Sturgill in the transaction.

In order to give Richie the full benefit of this argument we will assume that Martin occupies the place of Sturgill as stake-holder and consider the question as if it were a suit by Richie against Sturgill to recover from him the money. Looking at the matter from this standpoint is putting as favorable a view on the transaction as Richie could ask, and yet we are quite sure that Richie cannot have the relief he seeks. The arrangement between Richie and Cody was, as we have pointed out, corrupt and illegal, and the vicious qualities of the contract between them taint every aspect of the transaction to such an extent that neither of them should be afforded any redress in a court of justice on account of anything growing out of this business.

It is very true there is abundant authority for the proposition that money, wagered or bet and deposited in the hands of a stake-holder to be held by him until the outcome of the wager or bet is determined, may be recovered from the stake-holder by the person making the deposit while it is in the hands of the stake-holder. Donahoe v. McDonald, 92 Ky. 123; Connor v. Ragland, 15 B. Mon. 634; Hutchings v. Stilwell, 18 B. Mon. 776;

Turner v. Thompson, 107 Ky. 647; Gardner v. Ballard, 114 Ky. 93.

It should be said, however, that the decisions in these cases were rested on section 1959 of the Kentucky Statutes, providing that: "The stake-holder of any money, or other thing that may be staked on any bet or wager, shall, when thereto notified, return the same to the person making the stake or deposit, and, for failing to do so, the amount or value of the stake may be recovered from him by the party aggrieved."

But aside from this statute and the Kentucky cases, it is a general and well settled principle of law that money deposited with a stake-holder on account of a wager or bet of any kind may be recovered from the stake-holder while it is in his hands by the person making the deposit. Stacy v. Foss, 19 Maine 335, 36 Am. Dec. 755; McAllister v. Hoffman, 16 S. & R. (Penn.) 147, 16 Am. Dec. 556; 20 Cyc. 947; 14 A. & E. Ency. of Law 631; Bernard v. Taylor, 23 Oregon 416, 18 L. R. A. 859.

But in all of the cases that we have had opportunity to examine the stake-holder was holding the money pending the settlement of a wager or bet or the outcome of some kind of a gambling venture, and so holding it, he was held to be acting as the agent of the depositor with the right in the depositor to revoke the agency and demand the return of the deposit before it had been paid over. And a stake-holder in some of the authorities is defined as one in whose hands money or property is deposited to abide the event of a gambling contract. Dauler v. Hartman, 178 Penn. St. 23. For other definitions see Bouvier's Law Dictionary, title "stakeholder;" 36 Cyc. 813.

Ordinarily wagers or bets or gambling contracts do not affect the public generally, but only the individuals directly concerned in the transaction and consequently the courts hold that when an individual has made a deposit with a stake-holder of a sum of money to be paid over to another party on the happening of a certain contingency, although the transaction upon which the bet or wager was made may have been forbidden by law, the depositor may repudiate or withdraw his wager or bet and recover the deposit while in the hands of the stake-holder.

But the question we have goes far beyond the scope of an ordinary gambling contract or an ordinary viola-

tion of a statute. Its evil consequences were not confined to the persons immediately concerned in the transaction, and we are not disposed to extend to the facts appearing in this case the rule, that money on deposit with a mere stake-holder, awaiting the outcome of some wager or bet or the result of some gambling contract, may be recovered by the depositor.

Numerous cases can be found illustrating the disposition of the courts to put contracts that have a tendency to injure the public service, or to interfere with or corrupt the free exercise of the elective franchise, or that affect public offices, in a class distinct from mere gambling contracts or contracts involving the violation of a statute. Schneider v. Local Union, 116 La. 270, 5 L. R. A. (N. S.) 891; Basket v. Moss, 115 N. C. 448, 48 L. R. A. 842, 44 Am. St. Rep. 463; Livingston v. Page, 74 Vt. 356, 59 L. R. A. 336, 93 Am. St. Rep. 901; Exchange National Bank v. Henderson, 139 Ga. 260, 51 L. R. A. (N. S.) 549; Marshall v. Baltimore & Ohio R. R. Co., 16 Howard (U. S.) 314, 14 L. Ed. 953. See also Greenhow on Public Policy 338.

The intent of the rule laid down in these cases as well as in many others that might be referred to manifests a purpose on the part of the courts to protect public officers and public offices from all immoral and corrupting influences having a tendency to injuriously affect the public good, and there is no good reason why the wholesome principle running through these cases should not be extended and properly applied to the case we have. When so extended and applied it forbids that courts should grant to any person connected with such affairs the relief that might be afforded if the transaction were looked on merely as a gambling or illegal contract or arrangement and Sturgill or Martin regarded as mere stake-holders for the parties concerned in the venture.

This money was deposited by Richie with Sturgill pursuant to and as a part of a corrupt, immoral and illegal bargain deeply affecting the public interest. It was not deposited as a result of any wager or bet or gambling contract entered into between Richie and Cody that concerned them alone. The voters and the people of Knott county, irrespective of party affiliation, and especially the Republican voters of that county, were directly affected by the illegality and the immoral-

ity of this contract. In its essential elements the purpose of it was to obstruct and interfere with the elective franchise and to deprive by means of a corrupt bargain a body of citizens of the right to vote for the candidate of their party. And every contract that has for its essential purpose the obstruction of or interference with the elective franchise in any form or manner or that involves the trading or trafficking in public offices, concerns matters too serious to be regulated by rules of law applied in mere gambling contracts between individuals. Contracts such as the one entered into between Richie and Cody, and every branch of such contracts, and everything arising out of them, deserve the severest condemnation and no party to such a contract should be allowed to come into a court and obtain relief on account of anything connected with or arising on such a contract, unless it affirmatively appears that the party asking relief had in good faith rescinded or repudiated, or attempted in good faith to rescind or repudiate, the contract before any material thing looking to its accomplishment had been done by any person connected with it. If the person asking relief from anything growing out of such a contract can affirmatively show that after entering into the contract he changed his mind and in good faith abandoned the contract and everything connected with it before it was consummated he should have such relief as he would be entitled to in cases not affected by any vice or infirmity in the contract, but not otherwise.

And so in this case, if Richie had repented of his illegal purpose and demanded the return of this money before the withdrawal of Cody, we would say that he might recover it; but he did not do this. He did not seek to recover this money until long after Cody had withdrawn as a candidate or until long after the corrupt bargain had been consummated and everything that was contemplated by the parties to it had been accomplished.

For the reasons set forth in the opinion, the judgment is reversed, with directions to set aside the judgment against Martin and dismiss the cross-petition of Richie.